# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Sandy Carlese Thomas,              :       Case No. 1:13CV1777

      Plaintiff,                    :

vs.                                  :       **MAGISTRATE'S REPORT**
                                                **AND RECOMMENDATION**

Commissioner of Social Security Administration,   :

      Defendant.                 :

## I. INTRODUCTION.

Plaintiff seeks judicial review of a final decision of the Commissioner denying her application for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U. S. C. § 1381, *et seq.* and 405(g). Pending are Briefs on the Merits filed by both parties and Plaintiff's reply (Docket Nos. 14, 17 and & 18). For the reasons set forth below, the Magistrate recommends that this Court affirm the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On October 18, 2007, Plaintiff filed an application for SSI alleging disability beginning on June 1, 2007. Her claim was denied initially on February 7, 2008 and upon reconsideration on May 27, 2008. She requested a hearing on June 6, 2008 and on June 2, 2010, Administrative Law Judge (ALJ) John Murdock conducted a video hearing at which Plaintiff, represented by counsel, and Vocational Expert (VE) Bruce Holderead appeared. ALJ Murdock issued an unfavorable decision on July 30, 2010 (Docket No. 12, pp. 63-74 of 1199). The Appeals Council denied review of the ALJ's decision on July 29, 2011, thereby rendering

the ALJ's decision the final decision of the Commissioner (Docket No. 12, pp. 105-108 of 1199).

On September 15, 2010, Plaintiff filed the current application for SSI and any federally administered state supplementation under Title XVI of the Act, alleging that she became disabled on October 1, 2007 (Docket No. 12, pp. 198-200 of 887). Her application was denied initially on January 3, 2011 and upon reconsideration on May 7, 2011 (Docket No. 12, pp. 119-121; 127-129 of 1199). Plaintiff requested a hearing and Administrative Law Judge (ALJ) Joseph R. Doyle conducted a video hearing on March 8, 2012, at which Plaintiff, represented by counsel, and VE Brian L. Womer appeared (Docket No. 12, pp. 23; 38 of 1199). The ALJ issued an unfavorable decision on May 18, 2012 (Docket No. 12, p. 23-32 of 1199). On July 24, 2013, the Appeals Council denied review of the ALJ's decision, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 12, pp. 5-8 of 1199). Plaintiff timely filed for judicial review.

### III. FACTUAL BACKGROUND.

The following is a summary of the witnesses' testimony presented to ALJ Doyle on March 8, 2012.

### A. PLAINTIFF'S TESTIMONY

A high school graduate, Plaintiff was 48 years of age, 5'4" tall and weighed 233 pounds. She was right-hand dominant. Plaintiff was the mother of two teenage children (Docket No. 12, pp. 42-43 of 1199).

Her health complaints included pain in her shoulders, back, legs and knees, diabetes mellitus, and neuropathy in her left leg and fingers; however, Plaintiff testified that the degenerative back pain was the most severe impairment (Docket No. 12, pp. 43-44 of 1199). Plaintiff controlled her health conditions by: (1) taking Metformin, Percocet and using a Lidocaine patch, supplemented by over-the-counter analgesics, (2) wearing compression stockings even while sleeping, (3) sitting in a recliner, (4) using a special pillow as a buttress against her back when in bed and (5) consulting with an endocrinologist regarding proper diet, blood glucose levels, and insulin injections (Docket No. 11, pp. 44; 46; 47; 49; 53 of 1199). The discomfort from the strength of the compression stockings and the use a diuretic caused Plaintiff to awaken periodically

2

during the night to relieve the pressure of the stockings and to go to the bathroom (Docket No. 11, p. 48 of 1199).  The side effects of her medications included headaches, constipation and sulfuric burps (Docket No. 11, p. 49 of 1199).

Plaintiff reported that as a result of her impairments, she could not:  (1) lift more than seven pounds without developing shoulder paresthesia, (2) grasp and manipulate without difficulty, (3) stand for more than 25 minutes, (4) walk for 25 minutes without developing ankle edema and knee paresthesia  and (5) sit longer than 20 minutes without developing joint stiffness (Docket No. 12, pp. 44-45; 46 of 1199).

Plaintiff explained that she required assistance getting into the shower and putting on her shoes.  Thereafter, Plaintiff was engaged primarily in one or a combination of four activities:  (1) watching television, (2) using the computer, (3) keeping doctors' appointments and (4) checking blood sugars.  Plaintiff claimed that occasionally, she started the washer but generally she was not responsible for cleaning or cooking and she avoided any activity that required bending.  Because of the stairs leading to her apartment, Plaintiff rarely left the house except to shop, pay bills and visit the father of her children.  Plaintiff estimated that she only drove once biweekly because the vibrational motion caused swelling and inflammation of her extremities.  While shopping, Plaintiff used a motorized cart (Docket No. 13, pp. 46; 47; 50; 52 of 1199).

**B.    VE TESTIMONY.**

The VE testified that his responses to the first and second hypothetical questions were consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a compilation of data and definitions in selected industries that provides the best "snapshot" of how jobs are performed in the majority of industries across the country. The VE advised that his response to the third hypothetical was based on experience in job placement and vocational rehabilitation (Docket No. 12, pp. 54; 57-58 of 1199; Www.occupationalinfor.org).

The ALJ posed the *first* hypothetical question as follows:

Assume  an  individual  of  Plaintiff's  age,  education  and  experience,  who  is  capable  of

3

performing light work; except that this hypothetical individual could never climb using ladders, ropes or scaffolds; this individual could occasionally climb using ramps or stairs, stoop, kneel, crouch, crawl; engage in activities requiring balance and engage in overhead reaching bilaterally; this individual could frequently engage in handling or gross manipulation of objects bilaterally and fingering or fine manipulation of objects bilaterally, and this hypothetical individual should avoid concentrated exposure to extreme cold, wetness, operational control of moving machinery and unprotected heights.  Could this individual perform Plaintiff's past relevant work?

The VE responded that there would be competitive work that this hypothetical individual could perform and he proffered the following jobs existing in the State of Ohio and the national economy that could accommodate the restrictions in the first hypothetical:

| JOB/DOT NUMBER | NUMBER OF JOBS IN STATE OF OHIO AND NATIONALLY |
| --- | --- |
| Small parts assembler<br>706.684-022 | 10,000 and 1.25 million |
| Injection-molding machine tender<br>556.685-038 | 6,500 and 800,000 |
| Mail clerk<br>209.687-026 | 1,500 and 188,000 |

(Docket No. 12, pp. 55-56 of 1199).

The ALJ posed a *second* hypothetical:

Assume the same non-exertional limitations as hypothetical one; however, the hypothetical individual would be limited exertionally to sedentary work.  Would there be any competitive work such a hypothetical individual could perform?

The VE answered that there would be competitive jobs existing at the sedentary level.  Some examples include:

| JOB/DOT NUMBER | NUMBER OF JOBS IN STAT OF OHIO AND NATIONALLY |
| --- | --- |
| Food order clerk<br>209.567-014 | 1,500 and 200,000 |
| Charge account clerk<br>205.367-014 | 3,000 and 375,000 |
| Sorting machine operator<br>681.685-030 | 400 and 45,000 |

4

(Docket No. 12, p. 56 of 1199).

The ALJ posed a *third* hypothetical:

Assume the same limitations as hypothetical two; however, in addition, the hypothetical individual would miss significant time from work defined as three or more absences per month that would be excused or unscheduled.  Considering this hypothetical, would there be any competitive work?

In his opinion, the VE stated that an individual with that restriction or factor would not be able to maintain full time competitive employment on a sustained basis.  The average workplace tolerance for an individual who missed even one or two days per month on a month-after-month basis would not be able to maintain full-time competitive employment.  The VE explained that in his opinion, being off task more than 10% of the day would compromise the individual's ability to maintain full-time competitive employment (Docket No. 12, pp. 56-57 of 1199).

## IV.  PLAINTIFF'S MEDICAL HISTORY.

The following is a summary of Plaintiff's treatment history categorized by the health care provider and year of service.

**1.  ST. VINCENT CHARITY MEDICAL CENTER AND DR. PHILIP STICKNEY, AN ORTHOPEDIC SURGEON.**

**A.  2007**

Plaintiff obtained treatment for a sore throat on April 24 (Docket No. 12, pp. 655-660 of 1199); an earache, cough and nasal congestion on June 20 (Docket No. 12, pp. 646- 651 of 1199), and right shoulder pain on September 21 (Docket No. 12, pp. 637-642 of 1199).  Plaintiff underwent a MRI of the shoulder on October 5 and there were no signs of rotator cuff pathology (Docket No. 12, p. 830 of 1199).  On December 11, Dr. Stickney performed an arthroscopic decompression on Plaintiff's right shoulder impingement (Docket No. 12, pp. 503-505 of 1199; www.healthgrades.com/physician/dr-philip-stickney).

**B.  2008**

5

Plaintiff was treated for symptoms of left heel neuropathy on March 12 and seven days thereafter, she was diagnosed with acute cephalgia and a skull lesion.  On March 20, Plaintiff was diagnosed with a tension headache and continued on Motrin (Docket No. 12, pp. 497-500; 501-502; 628-633; 675-676 of 1199).

On April 16, Plaintiff underwent an arterial study which rendered normal results (Docket No. 12, p. 721 of 1199).

On May 20, Dr. Stickney performed an arthroscopic lysis of adhesions, capsular release, rotator interval excision and subacromial bursectomy (Docket No. 12, pp. 495-496 of 1199).

On July 28, Plaintiff was treated for left lower quadrant pain (Docket No. 11, pp. 622-623 of 1199).

On December 9, Dr. Stickney performed an arthroscopic subacromial decompression and acromioclavicular joint resection (Docket No. 11, pp. 493-494; 810-811 of 1199).

## C.    2009

Plaintiff presented with a bruised kneecap on January 5 (Docket No. 12, pp. 617-618 of 1199) and on March 27, she was treated for cephalgia (Docket No. 12, pp. 608-613 of 1199).  The MRI of her lumbar spine taken on April 17, showed minimal L4-5 and L5-S1 level disease (Docket No. 12, pp. 777-778 of 1119).

Plaintiff commenced occupational and physical therapies.  In occupational therapy, Plaintiff plateaued on June 25 and no further services were ordered.  As a result of physical therapy, Plaintiff reported decreased pain in the low back and knees (Docket No. 12, pp. 722-761 of 1199).

On June 25, Plaintiff reported to Dr. Stickney that she was doing well; that she had excellent motion and good strength and that she had occasional activity related pain (Docket No. 12, p. 788 of 1199).

On September 7, Plaintiff presented and obtained treatment for complaints of pain and frequent urination (Docket No. 12, p. 599 of 1199).

Plaintiff underwent oral surgery on October 9 (Docket No. 12, pp. 491-492 of 1199).  No cardiac

abnormalities were discovered although Plaintiff complained of heart palpitations on October 29 (Docket No. 12, pp. 585-590 of 1199).

On November 3, Plaintiff was treated for a "lump in her throat."  Her thyroid was inflamed and on November 13, the presence of a tiny right thyroid cyst was revealed (Docket No. 11, pp. 577-582; 689 of 1199).

### D.    2010

Plaintiff was treated for a middle ear infection on February 21 (Docket No. 11, pp. 564-574 of 1199); on February 22, Plaintiff underwent an upper gastrointestinal endoscopy, a procedure utilizing an instrument to view the interior lining of her esophagus, stomach and small intestine (Docket No. 12, p. 450 of 1199; www.webmd.com/digestive-disorders/upper gastrointestinal endoscopy).

On March 2, her black stool was considered the likely result of an upper gastrointestinal bleed (Docket No. 12, pp. 489-490; 557-564 of 1199).  On March 24, Plaintiff was treated at the emergency room for a sore throat (Docket No. 12, pp. 546-556 of 1199).

Plaintiff presented to the emergency room again on April 10, complaining that her "stomach was hard."  The emergency room physician speculated that some possible causes included the recent nerve block, increased blood sugars or constipation (Docket No. 11, pp. 536-545 of 1199).  On April 20, Plaintiff underwent a hearing assessment, the results of which showed a normal middle ear, normal mobility of the eardrum and normal peripheral hearing bilaterally (Docket No. 12, pp. 662-664 of 1199).

The CT scan of Plaintiff's abdomen taken on May 14, showed tiny fat containing umbilical hernia and left lower lobe collapse or scar (Docket No. 12, p. 684 of 1199).

On June 30, Plaintiff presented to the emergency room with a change in bowel pattern, constipation and abdominal pain.  An endoscopic study was performed and the colon appeared normal with the exception of small internal hemorrhoids.  Plaintiff was discharged with medication for constipation and a stool softener

(Docket No. 12, pp. 294-309; 448 of 1199).

On July 7, Plaintiff presented to the emergency room complaining of persistent constipation.  She was given an enema (Docket No. 11, pp. 526-535 of 1199).  Plaintiff presented to the emergency room on July 31 with complaints of acid reflux, diarrhea and vomiting.  From the stool sample collected, the examiner detected a rare white blood count (WBC) and a rare breakdown of crystal structures in the WBC.  Plaintiff was ultimately diagnosed with gastroenteritis (Docket No. 12, pp. 445; 517-525 of 1199).

Dr. Stickney ordered an MRI on August 16 and conducted a follow-up examination on September 8.  There was no MRI evidence of a re-tear and Plaintiff's biceps tendon were intact.  Dr. Stickney attributed Plaintiff's problems to bilateral knee arthritis (Docket No. 12, pp. 764-769 of 1199).

On September 18, Plaintiff was treated at the emergency room after she fell and suffered an abrasion to her right knee.  There was no evidence of fracture, dislocation or obvious effusion (Docket No. 11, pp. 508-515; 681-683 of 1199).  On September 24, Plaintiff presented with right knee pain and injury.  The three-phrase bone scan of the knees showed diagnostic evidence of possible soft tissue swelling or bursitis.  There was no evidence of abnormal activity on delayed images to suggest bone abnormality (Docket No. 12, p. 680 of 1199).

Imaging from the bone scan study administered on or about October 13, showed mildly increased uptake about the patella (Docket No. 12, p. 781 of 1199).  Plaintiff treated on October 19 for low back and bilateral leg pain (Docket No. 12, pp. 1159-1162 of 1199).

Dr. Stickney performed a meniscectomy, medial plica release and surgery of the cartilage of the patella on November 9.  Incidentally, Plaintiff's glucose level significantly exceeded the normal values (Docket No. 12, pp. 832-833; 1038 of 1199).

Plaintiff was tested for an urinary tract infection and prescribed medication used to ease the pain and discomfort on December 14 (Docket No. 12, pp. 856-865 of 1199).

**E.      2011**

Plaintiff suffered with pain and swelling in her right leg and she presented to the emergency room on February 17.  The presence of deep vein thrombosis was ruled out (Docket No. 12, p. 844 of 1199).

An upper gastrointestinal endoscopy was performed on March 11, and the MRI administered on March 17, showed:

- Broad based disc protrusion at L3/L4.
- Mild left foraminal encroachment.
- Broad based left paracentral lateral disc protrusion at L4/L5.
- Right paracentral and foramina disc protrusion at L5/S1.
- Facet arthropathy and lateral bulging disc (Docket No. 12, p. 996 of 1199).

On March 31, Plaintiff returned to the DEPARTMENT OF ENDOCRINOLOGY for diabetes management (Docket No. 12, pp. 1153-1158 of 1199).

On April 11, the attending physician addressed Plaintiff's complaints about a lump on the bottom of her right great toe (Docket No. 12, pp. 985-995 of 1199).  Plaintiff was provided treatment for the presence of right underarm cysts on April 22 (Docket No. 12, pp. 975-984 of 1199).

From May 4 through May 23, Plaintiff attended five sessions of physical therapy.  She was discharged to aquatic therapy (Docket No. 12, p. 959 of 1199).  Plaintiff's routine chemistry tests administered on May 31, showed elevated glucose and potassium levels (Docket No. 12, p. 957 of 1199).

On August 16, Plaintiff was treated for left flank pain (Docket No. 11, pp. 1131-1140 of 1199). Plaintiff presented to the PAIN MANAGEMENT CENTER on August 31, with complaints of right knee and low back pain.  Dr. Sumit Katyal, M.D., a specialist in pain medicine, diagnosed Plaintiff with lumbosacral spondylosis without myelopathy.  He suggested that Plaintiff undergo psychological assessment and opined that Plaintiff help herself by losing weight, withdrawing from nicotine use and continuing in physical therapy (Docket No. 11, pp. 1144-1151 of 1199; www.healtlhgrades.com/physician/dr-sumit-katyal).

Plaintiff was treated for a bladder infection on November 8 and a possible bladder infection on

November 19 (Docket No. 12, pp. 1102-1111; 1112-1121 of 1199).

On December 5, an abscess in Plaintiff's sweat gland was drained (Docket No. 12, pp. 1092-1101 of 1199).

2.    CLEVELAND CLINIC (CC).
      A.    2009

Plaintiff was advised to use Extra Strength Tylenol® and Aleve® to treat lower leg and joint pain on January 7 (Docket No. 12, pp. 399-400 of 1199).  Diagnosed with left knee anserine bursitis and left knee mild effusion, Plaintiff's knee was aspirated on January 17 (Docket No. 12, pp. 397-399 of 1199).

On February 5, the results from the MRI of Plaintiff's knees administered on February 5, showed a 50% change of a small tear in the inferior surface of the posterior horn medial meniscus in the left and mild edema in the right (Docket No. 12, pp. 400-402 of 1199).  Plaintiff presented to the RHEUMATOLOGY DEPARTMENT on February 6, complaining that the injections to her knee did not prove to be helpful.  Her knee continued to freeze; she had chronic pain and the sharp, numb feeling persisted.  The pain medication was continued and plans were made for an orthopedic consultation (Docket No. 11, pp. 394-396 of 1199).

On March 16, Plaintiff presented for the first time to the ENDOCRINOLOGY DEPARTMENT and Dr. Mario Skugor, M. D., a specialist in endocrinology, diabetes and metabolism, referred her to a neurologist, opining that except for the nerve entrapment syndrome, Plaintiff's left leg pain was not typical of diabetic syndrome (Docket No. 12, pp. 389-393 of 1199; www.healthgrades.com/physician.dr-mario-skugor).  Plaintiff presented to the CC CENTER FOR SPINE HEALTH on March 31, with complaints of left lower extremity pain and left anterior shin pain.  Dr. Tagreed M. Khalaf, M.D., a sports medicine specialist, diagnosed her with pain in soft tissue of the limb and lumbago, a descriptive term denoting pain in the mid and lower back of an unspecified cause, and referred Plaintiff for comprehensive physical therapy(Docket

No. 12, pp. 380-384; 387-388; 443 of 1199; www.healthgrades.com/physicain/dr-tagreed-khalaf; STEDMAN'S MEDICAL DICTIONARY 233310 (27th ed. 2000)).

On April 1, Plaintiff presented to the DEPARTMENT OF ORTHOPAEDICS, complaining of left knee pain. She was prescribed a narcotic pain reliever (Docket No. 12, pp. 377-379 of 1199).  Results from the X-ray of the lumbar spine confirmed the presence of lumbago (Docket No. 12, pp. 385-386 of 1199).  On April 8, Plaintiff was prescribed a nicotine patch after an assessment in the TOBACCO TREATMENT CENTER (Docket No. 12, pp. 367-376 of 1199).  On April 13, Plaintiff reported that she had been taking Aleve® up to four times daily without relief and she was again, prescribed a narcotic pain reliever (Docket No. 12, pp. 363-364 of 1199).  On April 14, Plaintiff reported that she observed no benefits or side effects from taking Neurontin®, a medication used in the management of neuralgia, because she continued to have left shin pain (Docket No. 12, pp. 356-357 of 1199; PHYSICIAN'S DESK REFERENCE, 2006 WL 384572 (2006)).  Results from the MRI of the lumbar spine taken on April 17, showed a diffuse disk bulge toward the left through the left L4 nerve root outside the neural foramen; diffuse disk bulge which is slightly eccentric to the right side; and minimal L4-5 and L5-S1 level disease was detailed (Docket No. 11, pp. 360-362 of 1199).  On April 28, Plaintiff advised that she was doing well on Neurontin® and that her back pain persisted.  Plaintiff was encouraged to participate in physical therapy and continue to take her medication (Docket No. 12, pp. 352-353 of 1199).

On June 8, the dosage of Neurontin® was increased and a referral was made for injection interventions (Docket No. 12, pp. 348-351 of 1199).  Dr. Edwin L. Capulong, M.D., a specialist in pain medication at the DEPARTMENT OF SPINE INSTITUTE, administered a left L4 transforaminal injection on June 22 (Docket No. 12, pp. 344-346 of 1199; www.healthgrades.com/physician/dr-edwin-capulong).

Plaintiff presented on July 7, with bilateral extremity pain.  She was prescribed Celebrex®, a medication used to treat the symptoms of arthritis, and placed on a trial of Cymbalta, a medication used to treat both depression and peripheral neuropathy (Docket No. 12, pp. 340-343 of 1199).

Plaintiff underwent a neurological consultation on August 28 and Dr. Richard J. Lederman, M. D., a neurologist, used muscle and sensory testing to confirm the presence of neuropathic pain. He suggested that Plaintiff's nerve impairment was limited to the calcaneal nerves and that the only potential approach was to use medication for neuropathic pain or a nerve block (Docket No. 12, pp. 336-339 of 1199).

Plaintiff presented to the SPINE INSTITUTE on September 11, for treatment. Because Plaintiff had undergone a facet injection on June 22 with some success, the attending physician suggested an epidural steroid injection. It was also suggested that Plaintiff continue to take Cymbalta and that she add aqua therapy to her physical therapy regimen (Docket No. 11, pp. 332-335 of 1199).

Plaintiff presented to the DEPARTMENT OF ENDOCRINOLOGY for diabetes management on October 7 and a plan was developed to monitor Plaintiff's blood sugars and effectuate life changes through weight loss and smoking cessation (Docket No. 12, pp. 326-328 of 1199). Plaintiff was given a trigger point injection to stop low back pain on October 19 (Docket No. 12, pp. 322-325 of 1199). Plaintiff presented on October 21 for knee pain which erupted after she underwent the epidural injections. Medication used to provide continuous relief to osteoarthritis sufferers was injected into Plaintiff's knees. Plaintiff was advised to use Tylenol® Arthritis intermittently (Docket No. 12, pp. 318-320 of 1199).

Plaintiff presented on November 5 complaining of low back pain. Aqua therapy was recommended and a consultation was scheduled to assess the use of peripheral injections (Docket No. 11, pp. 314-317 of 1199).

On December 1, Plaintiff complained of back, shoulders, knees, lower legs and left heel pain. Plaintiff was prescribed Extra Strength Tylenol® and an injection was administered in each knee (Docket No. 12, pp. 310-312; 433-436 of 1199).

**B.    2010**

Plaintiff underwent a bilateral lumbar facet medial branch nerve block at L3-4, L4-5 and L5-S1 on

12

April 6 (Docket No. 12, pp. 413-416 of 1199).

Plaintiff presented to the CC PAIN MANAGEMENT CENTER complaining of intense pain on May 11. A pre-procedure diagnosis suggested lumbrosacral spondylosis without myelopathy.  Upon administering a procedure using heat generated by radio waves to damage specific nerves and temporarily interfere with their ability to transmit pain was employed on the left, the post-procedure diagnosis was the same:  lumbrosacral spondylosis without myelopathy (Docket No. 12, pp. 409-412 of 1199; www.mayoclinic.org/tests).  On May 14, the computed tomography (CT) scan results showed a left lower lobe collapse and " a tiny fat containing umbilical hernia" (Docket No. 12, pp. 480-481 of 1199).

On July 14, Plaintiff returned to the DEPARTMENT OF ENDOCRINOLOGY with an elevated blood sugar. A plan to monitor and record Plaintiff's blood sugar three times daily was implemented (Docket No. 12, pp. 402-407 of 1199).  A MRI of Plaintiff's right shoulder administered on August 19 was differentiated from the results of a MRI administered on October 5, 2007.  The results include evidence of:

- Post surgical changes that are compatible with a rotator cuff tear.
- Injury to the tendon.
- Mild acromioclavicular osteoarthritis and muscular atrophy of the supraspinatus.
- Lack of visualization of the intra-articular portion of the long head of the biceps tendon, which may be indicative of a tear.

(Docket No. 12, pp. 478-479 of 1199).

Film of Plaintiff's right knee taken on September 18 showed no acute fracture, dislocation or obvious effusion (Docket No. 12, p. 477 of 1199).  Plaintiff presented on September 21 to the CC PAIN MANAGEMENT DEPARTMENT for relief from back pain and left leg diabetic neuropathy.  Dr. Silvia E. Perez-Protto, M. D., a specialist in critical care medicine, did not order any prescriptions; instead, she gave Plaintiff a pain diary, a TENS unit, and encouraged her to continue exercising and participating in physical therapy (Docket No. 12, pp. 451-456 of 1199; www.healthgrades.com/physicain/dr-silva-e-perez-protto).  The X-ray of Plaintiff's right knee taken on September 24 showed slight activity in the right patella which **may** have been indicative of soft

tissue swelling or bursitis (Docket No. 12, p. 476 of 1199).

3.    **DR. GREGORY HALL, M.D.**

    A.    <u>**2011**</u>

Plaintiff presented to Dr. Hall's office on January 6, 2011 and March 1, 2011, to address leg and knee pain (Docket No. 12, pp. 1191-1192; 1193-1194 of 1199).  On March 29, 2011; April 26, 2011; and May 31, 2011, Plaintiff requested Dr. Hall's assistance in regulating her blood sugar (Docket No. 12, pp. 1182-1186; 1189-1190; 191 of 1199).  She returned on June 15, 2011, complaining that she had a recurring boil for which Dr. Hall prescribed an antibiotic (Docket No. 12, p. 1181 of 1199).

    B.    <u>**2012**</u>

During an office visit on January 12, 2012, Dr. Hall confirmed the diagnoses of polyneuropathy in diabetes, chronic shoulder pain, hypertension and diabetes.  He added Lyrica and Lantus®, a medication used to control blood sugar, to Plaintiff's drug regimen (Docket No. 12, pp. 1176-1180 of 1199).

## V.  STEPS TO EVALUATE ENTITLEMENT TO SSI

To establish entitlement to SSI, a claimant must prove that she or he is incapable of performing substantial gainful activity due to a medically determinable physical or mental impairment that can be expected to result in death or to last for at least twelve months.  42 U. S. C. § 1382c (a)(3)(A) (2014); 20 C.F.R. § 416.909 (2000); *Murphy v. Secretary of Health and Human Services*, 801 F. 2d 182, 183 (6th Cir. 1986); *Richardson v. Heckler*, 750 F. 2d 506, 509 (6th Cir. 1984).  The claimant must show that his/her impairment results from anatomical, physiological or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U. S. C. § 1382c (a)(3)(C) (2014); 20 C.F.R. §§ 416.913, 416.928 (2014).

To determine disability, the ALJ uses a five-step sequential evaluation process.  20 C.F.R. § 416.920 (a)-(f) (2000) (2014).  The ALJ considers whether the claimant:

(1)     is working and whether that work constitutes substantial gainful activity,
(2)     has a severe impairment,
(3)     has an impairment which meets or equals the durational requirements listed in Appendix 1 of Subpart P, Regulations No. 4,
(4)     can perform past relevant work, and
(5)     cannot perform his/her past relevant work, then his/her RFC, age, education and past work experience are considered to determine whether other jobs exist in significant numbers that accommodate him/her.  20 C.F.R. § 416.920 (2014).

A finding of disability requires an affirmative finding at step three or a negative finding at step five. The claimant bears the burden of proof at steps one to four, after which the burden shifts to the Commissioner at step five.  The ALJ's analysis at step five typically involves an evaluation of the claimant's RFC to perform a particular category of work (i.e., sedentary, light, medium, heavy or very heavy work), in combination with an application of the grid to determine whether an individual of the claimant's age, education and work experience could engage in substantial gainful activity.  *See* 20 C.F.R. Pt. 404, Subpart P, App. 2 (2014).

## VI.  SUMMARY OF THE ALJ'S DECISION.

Upon consideration of the entire record, the ALJ made the following findings.

• Plaintiff had not engaged in work activity since August 31, 2010, the application date.

• Plaintiff had the following severe impairments:

1.     Bilateral shoulder tendinopathy and osteoarthritis status post bilateral rotator cuff repairs.
2.     Osteoarthritis of bilateral knee status post right knee arthroscopic partial lateral meniscectomy and chondroplasty of the patella.
3.     Diabetes mellitus with neuropathy.
4.     Lumbosacral degenerative disc disease with spondylosis.
5.     Obesity.

• None of these impairments, individually or in combination with each other met or medically equaled the severity of one of the listed impairments in 20 C.F. R. Part 404, Appendix 1 to Subpart P.

• Plaintiff had the RFC to perform light work except that she could never climb ladders, ropes or scaffolds and she must avoid concentrated exposure to extreme cold, wetness, operational control of moving machinery and unprotected heights, but she could o*ccasionally* climb ramps and stairs; stoop; kneel; crawl; crouch; engage in activities requiring balance; and engage in

15

overhead reaching bilaterally; and she could *frequently* engage in handling or gross manipulation of objects bilaterally; and engage in fingering or fine manipulation of objects bilaterally.

• Plaintiff had no past relevant work.

• Plaintiff, a younger individual aged 18-49, had a high school education and was able to communicate in English.

• Plaintiff retained the RFC to perform less than a full range of light work at the exertional level described above.

• Plaintiff was not under a disability as defined in the Act since August 31, 2010, the date the application was filed (Docket No. 12, pp. 23-32 of 1199).

### VII. STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security is not *de novo*. *Norman v. Astrue,* 694 F.Supp.2d 738, 740 (N.D.Ohio,2010). Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his or her decision and if there is substantial evidence in the record to support his or her findings. *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir.2005)).

"Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S.Ct. 1420, 1427 (1971)). The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* at 740-741. To determine whether substantial evidence exists to support the ALJ's decision, a district court neither tries the case *de novo*, resolves conflicts in evidence, or decides questions of credibility. *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir.2007)). The district court must not focus, or base its decision, on a single piece of evidence, *Id.*, but the court must consider the totality of the evidence on record. *Id. (See Allen v. Califano*, 613 F.2d 139 (6th Cir.1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir.1978)).

If there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.*

16

In fact, the Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984)) (emphasis added)).  Therefore, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir.2003)).  Even if the decision is supported by substantial evidence the decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir.2007)).

## VIII. DISCUSSION

In her brief, Plaintiff contends that the ALJ generally failed to conduct a comprehensive review of the record and then capture her impairments accurately.  The Magistrate finds five legally cognizable claims for which the Court can conduct judicial review:

1.  The ALJ erred by failing to apply the prior ALJ's findings as required by *Drummond* v. *Commissioner,* 126 F. 3d 837 (6[th]Cir.1997).
2.  The ALJ erroneously relied on non-examining physicians.
3.  The ALJ failed to accurately assess her activities of daily living.
4.  The ALJ failed to "note" all of the evidence.
5.  The ALJ failed to pose hypothetical questions that accurately reflected Plaintiff's impairments.

Defendant responded:

1.  New and material evidence showed that Plaintiff's medical condition improved; thus, enabling Plaintiff to perform work at a higher exertional level.
2.  The record evidence supports the ALJ's hypothetical questions posed to the VE.

**1.** **PLAINTIFF ARGUES THAT ALJ DOYLE WAS BOUND BY ALJ MURDOCK'S DECISION THAT SHE COULD PERFORM SEDENTARY WORK.  ANY OTHER FINDING BY THE ALJ IS CONTRARY TO PRINCIPLES ESTABLISHED IN *DRUMMOND*.**

In *Drummond,* the Court held that absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ. *Id.* at 842. When adjudicating a subsequent disability claim, the ALJ must adhere to the finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding. *Id.* The burden is on the Commissioner to prove changed circumstances. *Id.* at 843.

The regulations provide a medical improvement test which permits the ALJ to find medical improvement related to an ability to do work if an increase in the current RFC is based on objective medical evidence. 20 C.F.R. § 404.1594(c)(2) (2014). The new RFC is then compared to the RFC at the time of the most recent favorable medical decision. 20 C.F.R. § 404.1594(c)(2) (2014) (2014). Unless an increase in the current RFC is based on changes in the signs, symptoms or laboratory findings, any medical improvement that has occurred will not be considered to be related to an ability to do work. 20 C.F.R. § 404.1594(c)(2) (2014).

The severity of three impairments has been decided in this case and absent evidence of improvement, the ALJ applied principles of *res judicata* to the litigation, reasoning that he was precluded from considering these issues again:

(1)    osteoarthritis of the knees and left leg.
(2)    diabetes mellitus with neuropathy.
(3)    lumbosacral spondylosis.

ALJ Doyle relied on ALJ Murdock's findings that Plaintiff's accounting of her knee symptoms were vague and there was no objective medical evidence to substantiate her allegations; that unless undergoing pain maintenance or surgery, Plaintiff's blood sugar was controlled; and that the laboratory tests were negative for abnormality and continued physical therapy improved levels of pain arising from lumbrosacral spondylosis (Docket No. 12, pp. 68-70 of 1199).

In assessing RFC, ALJ Doyle relied on documentary evidence chronicled from treating and examining

sources who saw Plaintiff after the conclusion of the first administrative hearing.  This new evidence reflected conservative treatment for symptoms of lower back pain and shoulder impingement and Plaintiff's continued improvement of impairment-related-pain along with full extremity strength and minimal range of motion limitations.  The record reflects that Plaintiff was engaged in activities with only a mild increase in pain after surgery and physical therapy in November 2010.  In March 2011, Dr. Stickney opined that Plaintiff had only moderately diminished lumbar range of motion and full upper extremity and lower extremity strength.  The ALJ reasonably concluded that these opinions were indicative of medical improvement.

Plaintiff's counter-argument is that ALJ Doyle succumbed to the temptation to play doctor and make his own independent medical findings of improvement exclusive of Dr. Stickney's indication of neurogenic claudication and his finding that Plaintiff's lumbar spine showed a decreased range of motion in all planes.  Plaintiff argues that these findings suggest deterioration, not improvement.

The MRI findings of lumbar stenosis are typically associated with neurogenic claudication, an intermittent limping caused by lumbar spinal stenosis.  STEDMAN'S MEDICAL DICTIONARY 360 (27th ed. 2000).  By its definition, the inability to ambulate effectively or an extreme limitation in the ability to walk is inferred.  Dr. Stickney addressed in great detail the limitations resulting from the spinal disease and he used neurogenic claudication as an indicator for diagnostic testing.  In other words, he administered a MRI to detect a possible source of Plaintiff's back pain and rule out unnecessary treatment of incidental findings.  Plaintiff did not complain of an inability to ambulate effectively and Dr. Stickney did not confirm that as a result of the MRI, Plaintiff's ability to ambulate was affected by her back pain.  Dr. Perez-Protto confirmed in September 2010 that Plaintiff had normal gait and range of motion in the lumbar spine.  This evidence was probative to the extent that Plaintiff's back condition did not affect her ability to ambulate.  The mere indication of neurogenic claudication was not probative of deterioration.

On April 3, 2011, Dr. Stickney determined that the lumbar spine showed decreased range of motion

19

in all planes.  This statement is neither indicative of deterioration nor disability dispositive.  Dr. Stickney failed to identify decreased range of motion in all planes as a severe abnormality or impairment, speculate as to its implications on the long-term prognosis, or propound a course of treatment.  Rather, Dr. Stickney noted that so long as Plaintiff participated in physical therapy, she reported a benefit to the lumbar range of motion (Docket No. 12, p.1080 of 1199).  Plaintiff failed to present other evidence or authority that she has a decreased tolerance for any of her functional abilities resulting from a decreased range of motion in all planes. The probability of this unbalanced finding changing the outcome of the Commissioner's decision is minuscule.

In conclusion, the Magistrate finds that the signs, symptoms and laboratory findings as a whole show that Plaintiff's physical impairments:  osteoarthritis of the knees and left leg, diabetes mellitus with neuropathy and lumbosacral spondylosis, had not worsened since the prior final decision.  The medical evidence shows the Plaintiff experienced medical improvement through a decrease in the severity of her impairments through medication and physical therapy.  Accordingly, the undersigned recommends that the Court defer to the Commissioner's findings.

2.      DID THE ALJ ERR BY RELYING ON THE OPINIONS OF DRS. MARIA CONGBALAY AND SARAH LONG, NON-EXAMINING STATE AGENCY CONSULTANTS TO DETERMINE DISABILITY.

The SSA regulations provide that the rules for considering medical and other opinions of treating sources and other sources also apply when the SSA considers the medical opinions of non-examining sources, including state agency medical and psychological consultants and other program medical sources.  20 C.F.R. § 404.1527(e).  While there are progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker, opinions of medical sources who do not have a treatment relationship with a claimant are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.  TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT

THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, SSR 96-6p, 1996 WL 374180 (July 2, 1996).  For this reason, the opinions of state agency medical and psychological consultants and other program medical sources can be given weight if they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence, including any evidence received at the ALJ and Appeals Council levels that was not before the state agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the state agency medical or psychological consultant or other program medical source.  *Id.*

Because State agency medical and psychological consultants are highly qualified psychologists who are also experts in Social Security disability evaluation, an ALJ must consider findings of State agency psychological consultants as opinion evidence.  *Id.*  While ALJs are not bound by the findings made by State agency psychologists, they may not ignore their opinions and they must explain the weight given to the opinions in their decisions.  *Id.*

The ALJ appropriately acknowledged the opinions of Drs. Congbalay and Long to determine RFC. The Magistrate agrees that the specialty of these physicians has not been declared on the disability forms; however, there is a rebuttable presumption that regardless of their speciality, they are experts in Social Security disability evaluation procedure who have been vetted by the Social Security Administration.  Plaintiff has failed to overcome this presumption.  The ALJ did not give greater weight to the opinions of the state agency physicians where the opinion of the treating physician regarding the nature and severity of Plaintiff's condition was well-supported by medically acceptable clinical and laboratory diagnostic techniques and was consistent with other substantial evidence.  Instead, the ALJ attached significant weight to the state agency physician opinions in the RFC area where there were fairly benign physical examination findings made by the treating or examining physicians.  Because the ALJ applied the correct legal standards in assessing state

agency opinion, the Magistrate recommends that the Court affirm the Commissioner's decision as to Plaintiff's second claim.

3.   DID THE ALJ FAIL TO EXPLAIN THAT PLAINTIFF'S DAILY ACTIVITIES WERE PERFORMED INTERMITTENTLY, BUT NOT WITHOUT PAIN, NEVER ON A SUSTAINED BASIS AND ALWAYS IN HER HOME WITH ASSISTANCE.  DOES THE ABILITY TO PERFORM THESE TASKS UNDER THESE CIRCUMSTANCES DEMONSTRATE AN ABILITY TO PERFORM IN A WORKPLACE SETTING ON A SUSTAINED BASIS.

When a disability determination that would be fully favorable to the claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, Social Security Ruling (SSR) 96–7p, 1996 WL 374186 (July 2, 1996).  *White v. Commissioner of Social Security Administration*, 2013 WL 4817673, *20 -21 (N.D.Ohio,2013) (*See* SSR 96–7p, 61 Fed.Reg. 34483, 34484–34485 (1990)). These factors include, *inter alia,* the claimant's **daily activities.**  *Id.* (*citing Felisky v. Bowen*, 35 F.3d at 1039–1040 (6th Cir. 2004)).  Similarly, the Commissioner has provided examples of the types of evidence to be considered in making an RFC assessment, including reports of daily activities.  TITLES II AND XVI:  ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96–8p, 1996 WL 374184 (July 2, 1996).

The undersigned notes that the absence of sufficient objective medical evidence made credibility particularly relevant; therefore, ALJ Doyle was required to evaluate the intensity and persistence of any symptom to determine whether Plaintiff's subjective complaints were credible.  As part of his analysis, the ALJ considered Plaintiff's daily activities for the reason that the evidence in the record, including her reported daily activities, strength testing and relatively conservative medical treatment, simply were not consistent.

Activities of daily living are also necessary to determine fundamental functioning.  The ALJ appropriately considered Plaintiff's activities of daily living in assessing RFC and included a narrative

22

discussion describing the non-medical evidence, e.g., activities of daily living and how the evidence supports each conclusion. The ALJ rejected Plaintiff's testimony about the limitations in her ability to sit and stand because they were in direct contrast with her own description of activities that were reflective of an individual who was totally incapacitated. The ALJ specified in clear and sufficient detail the nature of the rejection as well as the basis for adopting the evidence deemed credible (Docket No. 12, pp. 29-30 of 1199).

Since the ALJ adequately explained his reasoning in making the findings on which his ultimate decision rests, the ALJ met his legal obligation to follow the regulations on these issues. Accordingly, the Magistrate recommends that this Court defer to the Commissioner's decision which affirms the ALJ's findings.

4.  **PLAINTIFF SUGGESTS THAT THE ALJ MADE A SERIES OF ERRORS BY FAILING TO NOTE ESSENTIAL FACTS AND RENDERING A WRITTEN DECISION INCORPORATING THESE FACTS.**

Ideally, judicial review is efficient if the ALJ articulates his or her reasons for crediting or discrediting each medical opinion; however, it is well settled that an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. *Mann v. Commissioner of Social Security*, 2013 WL 5432130, *9 (W.D.Mich.,2013) (*citing Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 507–08 (6th Cir.2006), *quoting Loral Defense Systems–Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999) (citations and internal quotation marks omitted)). The ALJ is only required to consider the evidence as a whole and reach a reasoned conclusion. *Id.*

Essentially Plaintiff is asking the Court to reweigh the evidence, give her the benefit of the doubt to the extent that these facts may weigh in her favor and then advance a different view; however, the Court is charged with determining the sufficiency of the evidence, not its weight. It appears that the ALJ considered all of the evidence as a whole before reaching a reasoned decision denying benefits. The ALJ's failure to note whether Plaintiff (1) complied with physical therapy by completing home exercises; (2) participated in pilates at the suggestion of her physical therapist; (3) had decreased sensation in her left knee or (4) underwent

23

aggressive medical care, may assist with documenting Plaintiff's pain and the treatment.  Such facts were considered by the ALJ and they do not enhance the ALJ's credibility determination, assist with making an equivalence argument or otherwise alter the result.  Notwithstanding the foregoing conclusion, the ALJ's failure to note these facts appears inconsequential to the outcome of disability and to the extent that the ALJ considered these facts, this Court does not have a role in second-guessing the ALJ's interpretation of these facts or the conclusions drawn therefrom.

5.    **PLAINTIFF CONTENDS THAT THE HYPOTHETICAL QUESTION POSED TO THE VE WAS INADEQUATE BECAUSE IT FAILED TO INCLUDE RESTRICTIONS FOR LIGHT OR SEDENTARY WORK**.

The Magistrate construes Plaintiff's argument that the hypothetical questions were inadequate because none of them included the physical restrictions for light work.  Where the VE testimony is used as substantive evidence to prove "the existence of a substantial number of jobs that plaintiff can perform, other than his past work, the testimony must be given in response to a hypothetical question that accurately describes the plaintiff in all significant, relevant respects."  *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir.1994).  The ALJ was required to incorporate into the hypothetical questions only those limitations accepted as credible.  *Casey v. Secretary of Health and Human Services,* 987 F. 2d, 1230, 1235 (6th Cir. 1993).

While Plaintiff is correct that the hypothetical question must accurately describe Plaintiff, Plaintiff has failed to show that the hypothetical questions given to the VE in this case did not do so.  The VE was knowledgeable of the definitions for light work and the ALJ included the description for light work in the first hypothetical.  To the extent that Plaintiff had physical work-related limitations, the ALJ fully accommodated them when he restricted Plaintiff to a range of light work as light work is defined under the Act.  He suggested additional limitations to light work. Plaintiff should never climb  ladders, ropes or scaffolds, avoid concentrated exposure to extreme cold, wetness, operational control of moving machinery and unprotected heights; she could occasionally climb using ramps and stairs, could occasionally stoop, kneel, crawl, crouch; engage in activities requiring balance and occasionally engage in overhead reaching bilaterally.  She could

frequently engage in handling, fingering, fine manipulation or gross manipulation of objects bilaterally. Similarly, the ALJ posed a second hypothetical question, asking that the VE consider whether Plaintiff could perform sedentary work as defined under the Act.

The Magistrate does not find that the ALJ erred in failing to include restrictions for light and sedentary work in the hypothetical questions posed to the VE. Based on the evidence, both hypothetical questions accurately portrayed the limitations found by the ALJ, and as such, the VE's testimony can be used to support the ALJ's conclusion that Plaintiff has the RFC for less than a full range of light work.

## IX. CONCLUSION

For the foregoing reasons, it is recommended that the Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.

/s/ Vernelis K. Armstrong
United Stats Magistrate Judge

Date: May 2, 2014

## X.  NOTICE

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have fourteen (14) days after being served in which to file objections to said Report and Recommendation.  A party desiring to respond to an objection must do so within fourteen (14) days after the objection has been served.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.